## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| BRIGITTE KOVACEVICH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 3:09-0068 |
| v. | ) | JUDGE ECHOLS |
| | ) | |
| VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

Plaintiff Brigitte Kovacevich, Ph.D. ("Plaintiff") filed a Motion For Partial Summary Judgment (Docket Entry No. 73), to which Defendant Vanderbilt University ("Vanderbilt") filed a response in opposition (Docket Entry No. 93). Vanderbilt filed a Motion For Summary Judgment (Docket Entry No. 76), to which Plaintiff filed a response in opposition (Docket Entry No. 108), and Vanderbilt filed a reply (Docket Entry No. 125). The Court will also consider in this opinion Defendant's Motion To Strike Report Of Dr. Estrada-Belli (Docket Entry No. 113), and Plaintiff's Motion To Strike Defendant's Response To Plaintiff's Statement Of Material Facts Which Preclude A Grant Of Summary Judgment, D.E. 126 (Docket Entry No. 135).

### I.  FACTS

The following facts are undisputed or are disputed but taken in a light most favorable to Plaintiff, Dr. Kovacevich.[1]  Plaintiff is currently employed as a tenure-track assistant professor in

---

[1]Plaintiff's Motion To Strike Defendant's Response To Plaintiff's Statement of Material Facts Which Preclude A Grant of Summary Judgment, D.E. 126 (Docket Entry No. 135) will be denied. The Court reviewed the voluminous summary judgment record, including the parties' very lengthy statements of undisputed facts and responses to those statements. (Docket Entry Nos. 78, 105, 106, 126 & 143.)  The Court carefully considered the application of the Federal and Local Rules in drafting this opinion. For that reason, a painstaking evaluation of whether particular

1

the Department of Anthropology at Southern Methodist University in Dallas, Texas. Plaintiff was employed by the University of Virginia for one year as a lecturer, she served as a visiting professor at Yale University for one semester, and she worked at several contract positions in archaeology that are non-academic positions.

From 1997 until August 2006, Plaintiff was a graduate student seeking a Doctor of Philosophy degree in Anthropology at Vanderbilt. Plaintiff was employed by Vanderbilt as a graduate teaching assistant for ten semesters between 1997 and 2004, and as a research assistant for one year from 2005 to 2006. Plaintiff successfully defended her thesis and received her Ph.D. degree in August 2006.

A teaching assistantship is essentially a form of financial aid for graduate students. Teaching assistants, or "TAs" may be assigned no more than twenty (20) hours of work per week. Specific duties vary and are determined by the combined decision of the leadership of the academic department in which the TA is employed and the specific faculty member to whom the TA is assigned. One component of the TA award is a salary for services rendered as a TA and the other component is a stipend for which no services are required. The salary is the same for all TAs throughout the College of Arts and Science, and that salary currently is $6,600 per academic year. The stipend may vary by department. A TA also receives a full-tuition scholarship and the student health insurance premium is paid by the College. In the Department of Anthropology, graduate students who do field work in connection with archaeological excavation are not considered as performing TA duties during their field work. Such work is performed only as part of the student's graduate education. (Docket Entry No. 80, McIntire Aff.)

_____

responses to statements of fact should be stricken is an unnecessary expenditure of judicial resources. The Court does not purport to include all facts set forth by the parties, but only those the Court deems significant.

From approximately 1999 until 2004, Plaintiff worked closely with Dr. Arthur A. Demarest, who also served as her doctoral thesis advisor. Dr. Demarest received his M.A. and Ph.D. degrees from Harvard University and joined Vanderbilt as an assistant professor of anthropology in 1984. He was promoted to the rank of full professor with tenure and named to the position of Centennial (now Ingram) Chair of Anthropology in 1986. His area of expertise is in archaeological excavation, and he has been involved in the excavation of ancient Mayan sites in Central America since 1976 and in the Republic of Guatemala since 1981. Dr. Demarest has completed twenty-seven field seasons as a project director in Guatemala and El Salvador. The projects have resulted in many published books and articles in Spanish and English. Dr. Demarest has also edited and co-edited a number of published volumes on Mesoamerican archaeological explorations and he is the editor of a series published by the Vanderbilt Institute of Mesoamerican Archaeology.

In order to excavate an archaeological site and surrounding area such as Cancuen in Guatemala, the participating scientists develop a strategy for the excavation that changes annually based on the discoveries of the previous season in the field and the analysis of recovered materials in the laboratories. Some zones are simply surveyed for mapping, in some areas artifacts are collected from the surface, in some areas two-by-two meter test units are excavated, and in other zones or sites nearby excavation is very intensive over wide areas. Once the actual excavations begin, the plan usually changes and excavation moves into other areas based on discoveries that are unearthed, although it depends on how well the original design was planned. During excavation, tens of thousands of fragments of ancient pottery, stone tools, and stone artifacts are recovered, including fragments of stone from broken tools and from the making of tools. The artifacts, including fragments of stones like flint and obsidian, are identified, tagged, and collected into bags to be studied more closely in the laboratories at the site and in Guatemala City.

Beginning in 1999, Plaintiff accompanied Dr. Demarest on the archeological excavation in Cancuen. She continued to make annual trips to Cancuen during the "digging" season from 1999 until 2004. Early in her work on the Cancuen project, Plaintiff discovered a large lithic deposit in the northern part of the site. "Lithics" is the study of stone artifacts, such as jade, chert and obsidian. Having prior formal training in lithics, Plaintiff elected to concentrate her studies in that area.

From approximately 2000 through the first two or three years of excavation, the mapping of Cancuen was done by Vanderbilt graduate students and two or three Guatemalan students. In 2002, Marc Wolf, a professional topographer who has over 20 years of experience mapping sites throughout Central America and elsewhere, was hired to map the site. The Cancuen project continued after Plaintiff was last on the site in the summer of 2004. Since 2005, the development work and restoration of architecture has kept the scientists in Cancuen on a year-round basis.

After completing her work in the field in Cancuen in 2003 and in the laboratory in 2004, Plaintiff began working in earnest to complete her doctoral thesis based on her work at the Cancuen excavation. Plaintiff's thesis focused on an analysis of the lithics at the site, including lithic deposits found in various ruins of structures excavated by her and other members of the team. Some of her interpretations were based on a traditional classification of structures decided upon by Tomas Barrientos, Plaintiff and Dr. Demarest, which was modified from previous archaeological projects in the Maya area. Neither the principal laboratory consultant, Dr. Ronald Bishop of the Smithsonian Institute, nor any other member of the Cancuen project closely familiar with the project's work, except for Dr. Demarest, was a member of Plaintiff's thesis committee. Dr. William Fowler, a Vanderbilt professor who is a Mayan lithics expert, was a member of Plaintiff's thesis committee.

In 2004 or 2005, Plaintiff and certain other graduate students filed a complaint against Dr. Demarest with Vanderbilt's Opportunity Development Center alleging sex discrimination, sexual

harassment, and retaliation directed at Plaintiff and other female graduate students by Dr. Demarest. Plaintiff alleges that Dr. Demarest shortly thereafter learned of the complaint filed against him, and he launched a continuing campaign of retaliation against Plaintiff for exercising her right to oppose sex discrimination and sexual harassment. Previously, Dr. Demarest had told another person that Plaintiff was his best student and he did not have any problem with her work. After the charge was filed, Dr. Demarest's criticism of Plaintiff began. (Docket Entry No. 128-1, Kovacevich Depo. Vol. I at 76.)

In 2004 or 2005, Dr. Demarest withdrew his support for Plaintiff to obtain any further financial assistance from Vanderbilt for her doctoral studies, so Plaintiff obtained an assistantship with other Vanderbilt professors. Plaintiff filed a charge with the Equal Employment Opportunity Commission and, after receiving a right to sue letter, she filed a lawsuit in this Court against Vanderbilt and Dr. Demarest on August 10, 2007, alleging claims for sex discrimination, sexual harassment and retaliation under Title VII, Title IX, and the Tennessee Human Rights Act ("THRA"). Kovacevich v. Vanderbilt Univ. et al., No. 3:07-0828 (M.D. Tenn.) The parties settled the case in January 2008. More will be said about this settlement later in the opinion.

Against this backdrop of Plaintiff's university complaint and EEOC charge, adjustments were made in the procedure for the writing and evaluation of Plaintiff's dissertation. An agreement was reached on March 2, 2006, between the Department of Anthropology, represented by its Chair, Dr. Demarest, and Plaintiff which provided that the Dissertation Committee would be comprised of two Co-Chairs, Dr. Tom D. Dillehay and Dr. Demarest; two department members, Dr. John Janusek, Director of Graduate Studies, and Dr. William Fowler; and two outside readers. The agreement set out a procedure by which Plaintiff would submit her dissertation drafts to Dr. Demarest by overnight

5

express mail and Dr. Demarest would read the drafts and email his written comments to Dr. Dillehay

within two weeks.  The agreement provided in part:

> Dr. Demarest is expected to provide only constructive criticism on the dissertation
> chapters.  For obvious academic and intellectual reasons, he may disagree with Ms.
> Kovacevich's approach to and interpretation of the data, and, in turn, she may
> disagree with his suggestions and choose not to follow them.  Dr. Dillehay will read
> the comments for content and tone and, if satisfied that they are professionally
> suitable, distribute them to Ms. Kovacevich and the other committee members.  If
> Dr. Demarest's comments are negative beyond normal and justified scholarly
> criticism, Dr. Dillehay will return them to him for revision.  Dr. Demarest's
> questions and comments on the candidate's answers to them during the oral defense
> of the dissertation also will be subjected to the same scrutiny for content and tone.
> Further, Dr. Demarest will not be able to solely veto the dissertation and the
> dissertation defense.

(Docket Entry No. 100-1.)  The agreement also provided that "Dr. Demarest will not attend Ms.

Kovacevich's oral defense of the dissertation.  He is allowed to submit written questions, however;

written answers will be given to him."  (Docket Entry No. 100-1 at 2.)

The agreement restricted Dr. Demarest from writing letters of recommendation for Plaintiff,

from independently contacting possible employers of Plaintiff, and from commenting should he be

contacted by a potential employer concerning Plaintiff's candidacy for an academic position.

Likewise, Plaintiff was restricted from commenting if she was asked by a future employer why Dr.

Demarest had not written on her behalf.  The agreement contained other provisions concerning the

timeline for publication of the dissertation, intellectual property issues, and consequences for breach

of the agreement.  The agreement was signed by Dr. Demarest, Plaintiff, Dr. Dillehay and Dr.

Timothy McNamara, Associate Provost.

In the Spring of 2006, Plaintiff provided a draft of her thesis to Dr. Demarest for his review

and comments.  Over a period of several months in the late Spring and early Summer of 2006, Dr.

Demarest provided to Plaintiff, through Associate Provost McNamara, very detailed comments on

her drafts and constructive criticism and suggestions for her to incorporate, including an update on archaeological findings at Cancuen since 2003. Dr. Demarest noted a number of problems with Plaintiff's conclusions, primarily resulting from her reliance on interpretations of the site that were then out-dated and no longer valid. Post-2004 field seasons and analysis contradicted some of Dr. Demarest's own previous interpretations and conclusions. Dr. Demarest's thesis comments cautioned Plaintiff about making certain conclusory statements called into question by subsequent discoveries and analyses, but even though Plaintiff requested any new evidence, Dr. Demarest did not provide her with the materials. Dr. Demarest pointed out to Plaintiff that conclusions made by all of the scientists working on the site, including many of his own conclusions, had changed since 2002-2003, and that many of their earlier theories and conclusions had been shown to be wrong.

Dr. Demarest specifically advised Plaintiff that her paper needed to be more "modest" in its assertions and clearer about the preliminary nature of all of the early findings, she should not attempt to interpret the whole political structure of Cancuen, and she should reject the notion that economy and power relations at Cancuen are comparable to other partially excavated sites in other areas from which much of the then-current "fashionable" theory had been derived. Dr. Demarest also suggested that Plaintiff's monograph should emphasize the presentation of the unique workshop evidence, especially the jade and obsidian materials and production at the site. He emphasized to Plaintiff that the ongoing research at Cancuen, around Cancuen, and in the areas from Cancuen to Coban in the south and from Cancuen north to Seibol was changing the thinking and analyses regarding the Cancuen site. Because of the new information and new and revised analyses of previously-developed information, Dr. Demarest recommended that Plaintiff avoid specifics on certain aspects and acknowledge that she was basing her conclusions on a project that was ongoing.

7

While Plaintiff admits that Dr. Demarest made these written comments concerning her dissertation, she disputes that all of these comments or many other comments Dr. Demarest made in response to Plaintiff's dissertation drafts were supported by the archaeological evidence uncovered at Cancuen. She disputes that Dr. Demarest and his colleagues on the project were actually making efforts to issue corrections and changes to their own scholarship, and she points to evidence that the documents Dr. Demarest provided to the Guatemalan government to obtain necessary work permits also did not reflect the radical changes Dr. Demarest suggested were necessary when he commented on Plaintiff's dissertation. Moreover, although Dr. Demarest wrote to Plaintiff in November 2006 congratulating her on receiving her degree but expressing "disappointment" that he had not seen the final version of her thesis or signed off on it, Plaintiff contends that she sent Dr. Demarest an email link to the dissertation in August 2006 and states that he did sign off on the dissertation. Dr. Demarest made other assertions in the November 2006 letter about the content of Plaintiff's doctoral thesis, but Plaintiff disputes the accuracy of Dr. Demarest's remarks. Although Plaintiff admits that some of the statements in the letter were the same as the comments Dr. Demarest made concerning her thesis drafts, Plaintiff denies that Dr. Demarest made all of the comments earlier. Further, while Vanderbilt claims that Dr. Ron Bishop and Dr. Kazuo Aoyama informed Plaintiff that she relied on a faulty statistical analysis in her thesis and pointed out that some interpretations in the thesis did not correspond to the evidence and statistics she referenced, Plaintiff attests that Dr. Bishop told her he thought her dissertation was good, and Dr. Aoyama was generally very positive about the quality of the dissertation, even though Plaintiff and Dr. Aoyama disagree about how lithic patterns reflect economic patterns. (Kovacevich Aff. ¶¶ 17, 19.)

8

As mentioned previously, the parties settled Plaintiff's first lawsuit in January 2008. The settlement was memorialized in a confidential settlement agreement that contained many provisions aimed at resolving the complex dispute between the parties. The settlement agreement included a non-disparagement clause. While the Court recognizes the confidential nature of the settlement agreement, the Court cannot discuss the pending issues without quoting the language of a portion of the agreement. Section 5 provided in pertinent part as follows:

> 5.1 Defendants and their representatives, including attorneys, shall not publicly criticize, denigrate or make any disparaging remarks concerning Plaintiff. As to Vanderbilt, this provision shall apply only to Demarest, current members of the faculty of the Department of Anthropology (so long as they remain employed by Vanderbilt) and persons having express knowledge of this Agreement. Any claim by Plaintiff of any violation of this provision by Demarest shall be directed only against Demarest and not against Vanderbilt unless the alleged remarks can be shown to have been made with Vanderbilt's advance knowledge of, and express consent to, or knowing ratification of, such remarks. . . . Any failure by Vanderbilt to disavow any remarks by Demarest in violation of this Section, after being requested by Plaintiff to do so, may constitute evidence of ratification.

> * * *

> 5.5 This Section 5 shall not restrict Plaintiff or Demarest from making reasonable, good faith, and professional academic critiques or criticisms of the other's research, interpretations or published work in the context of scientific and academic discourse and peer evaluation. Notwithstanding the forgoing, all critical comments relating to the character, nature or reputation of either party are strictly prohibited by this Section 5.

> 5.6 This non-disparagement provision is a material term of this Agreement. All parties agree that, should a court of competent jurisdiction find that any party has violated this non-disparagement provision, the violating party will pay to each non-violating party the sum of $2,500 for each such violation as liquidated damages, and not as a fine or penalty, together with the reasonable court costs and attorneys' fees actually incurred in collecting such sum. The parties agree that this Agreement may be enforced in the Chancery Court for Davidson County, Tennessee.

(Docket Entry No. 10 at 5-6.)

Shortly after the settlement agreement was executed, in March 2008 Dr. Demarest presented an informal paper at the 2008 meeting of the Society of American Archaeology in Vancouver as part of a symposium on "Ancient Mayan Economics of Power: Elite Production and Distribution." Dr. Demarest admitted he prepared the informal rough draft of the paper the night before the presentation, although it was purportedly written by Dr. Demarest and five other scientists who work on the Cancuen project. For similar presentations, Dr. Demarest usually prepares a very rough draft of a paper and then presents an impromptu discussion of some of the main points with a few Power Point slides. Since the proceedings or presentations are not published, a "formal" written version of the presentation is not made available for distribution, although speakers may distribute a "reading version," without references or figures, for feedback from attendees. There are no "standards" for references or form in such unpublished distributed papers and they usually do not include primary data. Dr. Demarest and his coauthors created a "draft" copy, clearly designated in several places on the document as a "very rough draft," and made the paper available to all presentation attendees at the room's entrance.

Plaintiff and her husband, Michael Callaghan, a former graduate student in Anthropology at Vanderbilt, attended the Vancouver conference. Plaintiff presented her own paper and did not attend Dr. Demarest's presentation. Callaghan attended Dr. Demarest's presentation and took notes, but he did not obtain a copy of the rough draft paper because "[o]ne of the last conversations I had with him he told me that he was going to ruin my career, burn me, f— me, and destroy me. I wasn't going to go near him and ask for a copy of his presentation." (Docket Entry No. 116-1, Callaghan Depo. at 20.) Plaintiff also testified that Dr. Demarest "threatened me and others while we were on his project that if we went up against him, that he would ruin our careers and poison the ground that we walked on." (Docket Entry No. 85, Kovacevich Depo. Vol. I at 68.) Plaintiff also claimed

10

Dr. Demarest threatened that people's careers would be ruined for filing sexual harassment charges against him. (Docket Entry No. 128-1, Kovacevich Depo. at 70.)

According to Callaghan, during the March 2008 presentation, Dr. Demarest was "very nervous, kind of agitated, even angry, shaking a bit, sweating." ( Callaghan Depo. at 18.) Dr. Demarest's twenty-minute presentation was "pretty much off the cuff," and the gist of it was that "all of his and specifically Brigitte Kovacevich's interpretations of the [Cancuen] site were wrong and that he had new people redoing everything and that he now understood the site to be something that it wasn't." (Id.) According to Callaghan, Dr. Demarest did not offer evidence for any of the points that he made, and Dr. Demarest did not offer specific numbers, charts, graphs, or photos, although he did display slides of a number of maps. (Id. at 18-19.) Dr. Demarest claims his own contribution to the paper was a new synthetic interpretation regarding the role of noble merchants near the end of Classic Maya civilization, and this was the main point of the paper on which he sought feedback. (Demarest Decl. ¶ 36, Ex. 6.) Plaintiff disputes this, claiming the conclusion was taken from prior publications authored by Callaghan.

Dr. Demarest admitted he stated during his presentation that certain of Plaintiff's conclusions were wrong and that all the scientists were wrong (Docket Entry No. 129-1, Demarest Depo. at 77; Docket Entry No. 129-2, Demarest Depo. at 78), but he denied that he did not present new evidence found from 2004 to 2008 to support the conclusions made in his presentation about one of the most complicated sites in the Maya world. The parties dispute whether Dr. Demarest, assisted by others such as Marc Wolf, re-mapped the Cancuen site incorrectly in an effort to discredit the Plaintiff.

Callaghan estimated fifty (50) people attended Dr. Demarest's presentation, including Callaghan's graduate advisor, Dr. Francisco Estrada-Belli from Vanderbilt, but he could not recall anyone else who attended. (Id. at 20.) Callaghan thought it unusual that Dr. Demarest said

11

something like: "what I say is right may be speculation, but what I say is wrong is wrong." (Docket Entry No. 116-1, Callaghan Depo. at 38.)

Approximately two hours after Dr. Demarest's presentation, Callaghan told Plaintiff about the presentation and let her know that Dr. Demarest was talking about her research and saying it was all wrong. (Callaghan Depo. at 21-22.) According to Plaintiff, Callaghan told her Dr. Demarest was "attacking [her] work," that other attendees also informed her about Dr. Demarest's presentation, and she felt his entire paper was actually about her. Plaintiff believed she had been singled out for criticism by Dr. Demarest that was more harsh and damaging than criticism he directed at others, and that Dr. Demarest also took credit for ideas that were actually Plaintiff's. (Docket Entry No. 85, Kovacevich Depo. Vol. I at 24, 34-36, 91, 101.) In March 2008 when this symposium took place, Plaintiff was actively on the job market searching for a full-time, tenure track academic position with a leading university. In Plaintiff's view, the job of a professor is to help a graduate student procure employment. Instead, Dr. Demarest attacked her, but he did not attack other graduate students. (Docket Entry No. 128-1, Kovacevich Depo. Vol. I at 90.)

During the same symposium, Darrin Pratt, Director of the University of Colorado Press, was manning a booth not far from the booth Dr. Demarest set up for the Vanderbilt Press. During the two- to three-day event, Dr. Demarest spoke to Pratt approximately four times on different subjects. On one occasion, Dr. Demarest picked up a copy of a book the University of Colorado Press had published which included a chapter written by Plaintiff. Dr. Demarest told Pratt he did not believe Plaintiff had permission to use the illustrations that appeared in her chapter. (Docket Entry No. 129-2, Demarest Depo. at 106.)

When Pratt returned to his office after the symposium, he emailed one of the book's editors on April 2, 2008, pointing out the issue concerning the illustrations in Plaintiff's chapter and the

need for Plaintiff to obtain permission from the Guatemalan artist, Luis Fernando Luin, so there would be no copyright problems. In the email, Pratt stated, among other things: "Arthur Demarest was particularly upset about those [images] by Luis Fernando Luin, claiming that Brigitte never got their permission, and that Luis typically charges a fee[,]" and "Arthur stopped by the booth about 4 times to harass me about this, so I know it's on his mind." (Docket Entry No. 83, Ex. 1.) In his affidavit submitted in support of Vanderbilt's summary judgment motion, however, Pratt attests that his use of the term "harass" in the email "implies more than what actually happened. Dr. Demarest was not bothering me in any objectionable way, but was just raising what I felt was a legitimate issue on more than one occasion." (Docket Entry No. 83, Pratt Decl. ¶ 7.)

The book editor contacted Plaintiff about the copyright matter. Plaintiff thought it suspicious that Dr. Demarest raised this claim in March 2008, shortly after her lawsuit against him was settled, when the book had been in print for a year and Dr. Demarest had not made any prior allegations that Plaintiff used illustrations without permission. (Kovacevich Depo. Vol. I at 66-67.) Plaintiff did not share the email she received from the book editor with Dr. McNamara or anyone else at Vanderbilt. (Id. at 92.)

Plaintiff contends she was a close friend of Luin and she received his permission to use the illustrations prior to publication of the book. To resolve the issue, Plaintiff asked Luin to confirm that he had given prior permission to use the illustrations. Although at first Luin seemed cooperative, Plaintiff later received from Luin a series of emails with Microsoft Word documents attached to them in which Luin disagreed that he had given any such permission and demanded payment for use of the illustrations. Plaintiff questioned whether the emails were actually written by Luin or whether they were composed by Dr. Demarest based on the tone of the emails, their origination from an email address Plaintiff had never known Luin to use before, and her knowledge

13

that Luin feared Dr. Demarest. (Docket Entry No. 128-1, Kovacevich Depo. Vol. I at 56-58, 61-65.)

During this litigation, Plaintiff hired a computer forensics examiner, James R. Kempvanee of LogicForce Consulting, LLC, to examine the emails and attachments that Plaintiff received from Luin. Kempvanee determined that all three Microsoft Word documents attached to one email had been created on a computer where the preconfigured user name within the Microsoft Word program had been set to "Arturo Demarest," and each of the documents was last modified and saved by the user "afd sf" just before the documents were sent to Plaintiff. A Microsoft Word document attached to another email was created on a computer where the preconfigured user name within the Microsoft Word program had been set to "afd sf." The same user who created the document was the last person to save the document approximately four minutes before it was sent to Plaintiff using the guicho_luin@yahoo.com email account from a Guatemalan IP address. During his deposition, Kempvanee conceded he had no personal knowledge of who actually had access to the computers at the time the emails were created and sent. (Docket Entry No. 114-1, Kempvanee Depo. at 21.)

Dr. Demarest denied that he drafted the emails and documents. (Docket Entry No. 129-2, Demarest Depo. at 109.) Luin provided Vanderbilt with an affidavit in which he avers that he did not give Plaintiff permission to use his drawings in a non-project publication prior to her request for permission in April 2008. Luin also avers that he created the documents and emails sent to Plaintiff about the matter and he denies that Dr. Demarest created the documents and emails or instructed Luin to create them. (Docket Entry No. 82, Luin Aff. )

Plaintiff asserts that in July 2008, during a presentation in Guatemala City as part of the XXII Symposio de Investigaciones Arquelogicas en Guatemala, which she did not attend, Dr. Demarest continued his criticism of the Plaintiff's thesis. A Vanderbilt graduate student recorded the presentation at Plaintiff's request and provided a copy of the recording to Plaintiff. (Kovacevich

14

Depo. Vol. I at 39-40.)  Dr. Demarest presented a paper at that event supposedly co-authored by nine

different investigators, but Plaintiff claims there is no evidence as to the contributions, if any, of the

other co-authors.  Dr. Demarest spoke impromptu for approximately twenty-five minutes and made

comments similar, though not identical, to those made during the March 2008 symposium.

Plaintiff denies that remapping of the Cancuen site by Marc Wolf and subsequent

examination of her work by other scholars, such as Dr. Chloe Andrieu, a recent Ph.D. and lithics

expert from France, undermined Plaintiff's scholarship as Dr. Demarest claimed.[2]  According to

Plantiff, Dr. Andrieu did not obtain her Ph.D. until after 2007, and she did not gain access to

Plaintiff's database until after March 2008.  As of July 2, 2008, Dr. Andrieu had not analyzed

Cancuen materials from 2004 to 2008.  (Docket Entry No. 95.)  Plaintiff further contends that it is

rare in the field of archaeology that well-formulated initial hypotheses change dramatically.  She

denies that Dr. Demarest and his colleagues on the Cancuen project were radically changing their

positions as Dr. Demarest claimed.  She also disputes Dr. Demarest's position that his comments

at the March and July 2008 conferences constituted appropriate scholarly criticism of Plaintiff's

dissertation.[3]

---

[2]To support her contention that Vanderbilt inappropriately relies on the unreliable, inconsistent, and fabricated maps of the Cancuen site done by Marc Wolf, Plaintiff produced an expert report of Francisco Estrada-Belli, Ph.D., which addresses differences in various maps of the Cancuen site.  Vanderbilt filed a motion to strike the report of Dr. Estrada-Belli (Docket Entry No. 113) on the ground that Plaintiff did not disclose his name and report prior to the expert witness deadline on November 16, 2009.  The Court agrees that Plaintiff did not timely disclose Dr. Estrada-Belli as an expert witness.  Accordingly, the motion to strike will be granted and the Court has not considered Dr. Estrada-Belli's report in ruling on the summary judgment motion.

[3]In this vein Plaintiff produced the expert report of John Monaghan, Ph.D., Chair of the Department of Anthropology at the University of Illinois, and former Vanderbilt professor.  Dr. Monaghan examined the paper Dr. Demarest presented at the March 2008 symposium in Vancouver and opined that the criticism of Plaintiff's work did not meet accepted scholarly standards.
Vanderbilt filed a motion to exclude the testimony of Dr. Monaghan under Federal Rule of

Plaintiff asserts that Dr. Demarest's actions constitute unlawful retaliation for her sexual harassment complaints and prior lawsuit. She has no proof, however, that Dr. Demarest interfered with any specific academic position for which Plaintiff applied and was unsuccessful. (Docket Entry No. 85, Kovacevich Depo. Vol. I at 8-9.)

Plaintiff and Dr. Demarest each submitted lengthy affidavits in connection with the cross-motions for summary judgment. (Docket Entry No. 89, Dr. Demarest Aff.; Docket Entry No. 107, Dr. Kovacevich Aff.) In addition, the parties submitted excerpts from the depositions of Plaintiff and Dr. Demarest. (Docket Entry Nos. 85, 86, 128-1, 129-1, 129-2.) The Court observes that Dr. Demarest's affidavit embellishes extensively on his deposition testimony, but Plaintiff did not make a motion to exclude any portion of the affidavit. The testimony of these two individuals appears at times to be in broad disagreement as to the academic topics at issue, creating many factual disputes as to the available archaeological evidence from the Cancuen site and the proper interpretation of that evidence. In addition, Plaintiff supplies a 2008 evaluation of her dissertation by an outside reader, which appears to contradict assertions about the dissertation made by Dr. Demarest. (Docket Entry No. 101.)

In Plaintiff's opinion, the settlement agreement executed to resolve her prior lawsuit required her to take any future action only against Dr. Demarest in the case of his disparagement of her. But she did not believe his comments at the conferences constituted disparagement. (Kovacevich Depo. Vol. I at 92.) She testified that, absent the settlement agreement, there would be nothing wrong with Dr. Demarest's presentations as long as he relied upon other people's work in good faith. (Docket

_____

Evidence 702 and requested a hearing under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999). (Docket Entry No. 109.) The Court will hear argument and any evidence the parties wish to present on this motion at the Final Pretrial Conference.

16

Entry No. 86, Kovacevich Depo. Vol. II at 215-216.) Plaintiff sued Vanderbilt in this action, rather than Dr. Demarest directly, because she believed Vanderbilt did not take any action to curtail the conduct of Dr. Demarest, and because Dr. Demarest tried to interfere with her ability to publish by attacking the quality of her dissertation. (Docket Entry No. 128-1, Kovacevich Depo. Vol. I at 92.)

Plaintiff filed a new charge with the EEOC on April 8, 2008, alleging retaliation by Vanderbilt under Title VII. Plaintiff's filing of an EEOC charge prompted Vanderbilt to file a Complaint in the Chancery Court for Davidson County, Tennessee, on May 5, 2008, seeking to enjoin Plaintiff from pursuing her EEOC charge against Vanderbilt and seeking damages from Plaintiff in light of the terms of the prior settlement agreement. The Chancery Court denied Vanderbilt's motion for a preliminary injunction. When Plaintiff filed this federal action alleging retaliation under Title VII, Title IX, and the THRA, (Docket Entry No. 1), Vanderbilt answered and filed a counterclaim against Plaintiff, which included claims for declaratory judgment, specific performance of the settlement agreement, and breach of contract. (Docket Entry No. 8.) Vanderbilt admitted in the answer that Dr. Demarest acted in the scope of his employment and that he acted as Vanderbilt's agent. (Id. ¶ 8.)

Plaintiff filed a Motion For Partial Summary Judgment (Docket Entry No. 73) seeking summary judgment on paragraph 21 of her Complaint which alleged that Vanderbilt retaliated against her by filing the action in the Chancery Court. In paragraph 21, Plaintiff alleged:

> On or about May 5, 2008, defendant Vanderbilt in further retaliation for the plaintiff's exercise of her protected activity, namely the filing of the April, 2008 EEOC charge, filed a civil action against the plaintiff in the Chancery Court for Davidson County, Tennessee attempting to enjoin plaintiff from pursuing her EEOC charge and causing plaintiff to incur attorneys fees and other injury in an effort to restrain plaintiff from pursuing her constitutional and statutory right to file and to pursue her charge with the EEOC. The Court denied defendant Vanderbilt's motion for an injunction.

In the Answer, Vanderbilt responded to paragraph 21 as follows:

> The Defendant admits that it filed a complaint in the Chancery Court for Davidson County, Tennessee on May 5, 2008 seeking to enjoin the pursuit of the EEOC charge by the Plaintiff which was filed in direct violation of the terms and conditions of the confidential settlement agreement entered into between the Plaintiff, Dr. Demarest and the Defendant on January 3, 2008. The Defendant admits that the Court denied Vanderbilt's motion for a preliminary injunction.

In support of her motion, Plaintiff produced certified copies of all pleadings filed in the Chancery Court action. Vanderbilt then filed its Motion For Summary Judgment (Docket Entry No. 76) seeking summary judgment on Plaintiff's claims under Title VII, Title IX, and the THRA.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the

18

evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

**A. Plaintiff's Motion For Partial Summary Judgment**

Plaintiff relies on <u>EEOC v. Sundance Rehabilitation Corp.</u>, 466 F.3d 490, 498 (6th Cir. 2006), for the proposition that courts generally hold that prohibitions on filing charges with the EEOC are void and unenforceable as against public policy. She also cites <u>EEOC v. Frank's Nursery and Crafts, Inc.</u>, 177 F.3d 448, 456 (6th Cir. 1999), for the rule that waiver of the right to file a charge with the EEOC is void as against public policy.

The settlement agreement in the 2007 case did not expressly preclude Plaintiff from filing a future EEOC charge. The settlement agreement also contained, however, a non-disparagement provision which specifically addressed public academic discourse of the parties. Vanderbilt and Dr. Demarest agreed that they and their representatives would not publicly criticize, denigrate or make any disparaging remarks concerning Plaintiff. The clause specifically stated:

> As to Vanderbilt, this provision shall apply only to Demarest, current members of the faculty of the Department of Anthropology (so long as they remain employed by Vanderbilt) and persons having express knowledge of this Agreement. Any claim by Plaintiff of any violation of this provision by Demarest shall be directed only against Demarest and not against Vanderbilt unless the alleged remarks can be shown to have been made with Vanderbilt's advance knowledge of, and express consent to, or knowing ratification of, such remarks. . . . Any failure by Vanderbilt to disavow any remarks by Demarest in violation of this Section, after being requested by Plaintiff to do so, may constitute evidence of ratification.

(Docket Entry No. 10 at 5.) Section 5.5 expressly provided that "Section 5 shall not restrict Plaintiff or Demarest from making reasonable, good faith, and professional academic critiques or criticisms

19

of the other's research, interpretations or published work in the context of scientific and academic discourse and peer evaluation. Notwithstanding the forgoing, all critical comments relating to the character, nature or reputation of either party are strictly prohibited by this Section 5."

The Court has now had the opportunity to review the pleadings Vanderbilt filed in the Chancery Court action. Vanderbilt alleged that Plaintiff's April 2008 EEOC charge contained some of the same allegations of conduct dating back to 2004 that were included in Plaintiff's first EEOC charge and in the first federal Complaint, both of which were expressly dismissed and released by Plaintiff in the settlement agreement. (Docket Entry No. 72-2, Chancery Court Complaint ¶ 8.) Vanderbilt also alleged that the allegations in the second EEOC charge fell expressly within the provisions of the non-disparagement provision contained in paragraph 5.1 of the settlement agreement. (Id. ¶ 9.) Vanderbilt further alleged that under paragraph 5.1, any claim by Plaintiff that Dr. Demarest had publicly criticized, denigrated, or disparaged her was to be directed only against Dr. Demarest and not Vanderbilt, unless the alleged remarks could be shown to have been made with Vanderbilt's advance knowledge of, and express consent to, or knowing ratification of, the remarks. (Id.) Vanderbilt also alleged that section provided any failure by Vanderbilt to disavow any remarks made by Dr. Demarest in violation of the section, after being requested by Plaintiff to do so, may constitute evidence of ratification. (Id.) Vanderbilt alleged that it had not received any request from Plaintiff to disavow Dr. Demarest's remarks at the March 2008 academic conference or otherwise. (Id.)

In the Chancery Court Complaint, Vanderbilt sought declaratory judgment of its rights under the settlement agreement, specific performance of the settlement agreement, and injunctive relief, and it also alleged breach of contract. Dr. Kovacevich answered and counterclaimed against Vanderbilt and filed a Third-Party Complaint against Dr. Demarest. (Docket Entry Nos. 72-3 at 1-

20

11.) Dr. Kovacevich also filed a Motion For Judgment On The Pleadings on the aspect of her Counterclaim that Vanderbilt breached the confidentiality provision of the settlement agreement. (Docket Entry No. 72-3 at 18-20.)

The Chancery Court denied Vanderbilt's motion for an injunction because (1) Vanderbilt made no showing of any imminent risk of irreparable harm; (2) the relief would be largely mandatory rather than prohibitory; (3) Vanderbilt did not make a sufficient showing on the issue of likelihood of success on the merits; (4) the court was concerned about whether it should, as a matter of judicial policy and authority, intervene to interfere with an EEOC proceeding; and (5) the settlement agreement provided for liquidated damages and attorney's fees as a remedy for a breach of the non-disparagement clause. The Chancery Court also denied Dr. Kovacevich's motion for judgment on the pleadings because it was not clear that she was entitled to judgment as a matter of law given that the disclosure at issue was in a judicial proceeding involving a few, discrete provisions of the settlement agreement. (Docket Entry No. 72-3 at 41-43.)

The Court concludes that the issue whether Vanderbilt filed the Chancery Court lawsuit as an act of retaliation against Dr. Kovacevich or as a legitimate means to invoke the provisions of the settlement agreement Dr. Kovacevich signed is a question of fact for a jury to determine. The jury will have to determine what Dr. Demarest actually said and did during the March 2008 Vancouver conference that prompted Plaintiff's April 2008 EEOC charge and then decide whether Dr. Demarest's conduct fell within the non-disparagement provision of the settlement agreement. If it did, a jury could reasonably find that Vanderbilt was justified in seeking to enforce the settlement agreement terms against Plaintiff. If it did not, a jury could reasonably find that Vanderbilt did not have a sufficient basis on which to file the Chancery Court lawsuit and that Vanderbilt retaliated

21

against the Plaintiff for filing the second EEOC charge. Because genuine issues of material fact exist, Plaintiff's motion for partial summary judgment will be denied.

**B. Vanderbilt's Motion For Summary Judgment**

The parties agree that a retaliation claim may be proved by direct or circumstantial evidence, and in this circumstantial evidence case, the burden-shifting paradigm of McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256-259 (1981), applies. To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in protected activity; (2) Vanderbilt knew that she exercised her protected civil rights; (3) the Plaintiff was subjected to materially adverse action; and (4) there is a causal link between the protected activity and the adverse action. Harris v. Metropolitan Gov't of Nashville and Davidson County, 594 F.3d 476, 485 (6th Cir. 2010) (Title VII case). Since courts generally look to Title VII as an analog for the legal standards to apply in Title IX discrimination and retaliation claims, the elements of a Title IX retaliation case are similar. Nelson v. Christian Bros. Univ., 226 Fed.Appx. 448, 454 (6th Cir. 2007); Arceneaux v. Vanderbilt Univ., 25 Fed. Appx. 345, 347 (6th Cir. 2001). THRA claims are also analyzed under Title VII law. Madden v. Chattanooga City Wide Serv. Dept., 549 F.3d 666, 673 (6th Cir. 2008).

Vanderbilt first contends that Plaintiff cannot proceed under Title VII or the THRA because her present retaliation claims are unrelated to her employment by Vanderbilt. Vanderbilt asserts that Plaintiff cannot invoke the protections of Title VII because she was primarily a graduate student at Vanderbilt and, although she performed some teaching and research activities as a TA or Research Assistant, the dominant purpose of her relationship with Vanderbilt was educational. Her current complaints, moreover, relate solely to her academic activities as a graduate student and conduct that occurred long after she received her Ph.D. degree.

22

Vanderbilt discusses cases which address whether a graduate student assistant is an "employee" for purposes of Title VII. The Sixth Circuit apparently has not ruled on this topic. Some courts have considered the dual role of graduate students as both university students and employees hired for teaching and research assistantships and concluded that Title VII applies to conduct that occurs while the plaintiff is in employment status, but not in student status. See e.g., Bakhtiari v. Lutz, 507 F.3d 1132, 1137-1138 (8th Cir. 2007) (holding former graduate student and teaching assistant could not proceed under Title VII because he made complaints about the university as a university, not as his employer); Seaton v. University of Pennsylvania, 2001 WL 1526282 *8 (E.D. Pa. Nov. 30, 2001) (holding graduate student could not proceed under Title VII because complaint did not suggest student was retaliated against as employee, but as student); Bucklen v. Rensselaer Polytechnic Institute, 166 F.Supp.2d 721, 725-726 (N.D. N.Y. 2001) (same); Stilley v. University of Pittsburgh, 968 F.Supp. 252, 261 (W.D. Pa. 1996) (holding all issues pertaining to completion of plaintiff's dissertation related to plaintiff's role as student and not as employee); Pollack v. Rice Univ., 1982 WL 296 * (S.D. Tex. Mar. 29, 1982) (holding plaintiff could not proceed under Title VII for religious discrimination in admission to scholastic program which entailed performance of services for remuneration but where such services were completely incidental to scholastic program). Based on the analyses of these cases, Vanderbilt argues that Plaintiff's present dispute with Dr. Demarest concerns good faith, scholarly disagreement on an academic subject, Plaintiff admitted Dr. Demarest did not take any specific action to interfere with Plaintiff's attempts to locate full-time, tenure-track academic employment, and thus, Plaintiff cannot prove a materially adverse employment action occurred.

This argument might have been pertinent had it been raised in the prior 2007 action Plaintiff filed as a Vanderbilt graduate student and graduate assistant in which she alleged sex discrimination,

23

sexual harassment, and retaliation. In the Complaint filed in the prior case, <u>Kovacevich v. Vanderbilt Univ. et al.</u>, No. 3:07-0828, Plaintiff alleged that illegal discrimination and retaliation took place during her graduate education and her graduate employment at Vanderbilt. (No. 3:07-0828, Docket Entry No. 1, Complaint ¶¶ 9-16.) Whether Plaintiff was entitled to proceed under Title VII and the THRA as a graduate student and/or as a Vanderbilt employee was not decided in the prior case because the parties reached a settlement as memorialized in their written agreement. This case focuses on the retaliation Plaintiff alleges she experienced after she engaged in protected Title VII activity in the prior case and reached a settlement agreement in the federal lawsuit. She alleges that, despite the terms of the settlement agreement and the requirements of federal and state laws, Dr. Demarest has taken concerted action to discredit her and sabotage her career in retaliation for her protected activity.

In <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 57 (2006), the Supreme Court explained that "the antiretaliation provision [of Title VII] does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." The Supreme Court noted that an "employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." <u>Id.</u> at 63. If all actions and harms outside the workplace were eliminated, the Supreme Court reasoned, the antiretaliation statute's objective would not be achieved. <u>Id.</u>

In <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997), the Supreme Court held that former employees may pursue Title VII claims for retaliation; otherwise the effectiveness of Title VII would be undermined "by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC," and there would be a "perverse incentive for employers to fire employees who might bring Title VII claims." Similarly, Title IX is broadly

24

worded such that "[w]here the retaliation occurs because the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 179 (2005). Congress enacted Title IX to prevent the use of federal dollars to support discriminatory practices and to provide individual citizens effective protection against those practices. Id. "Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished." Id. Therefore, Plaintiff's Title VII, THRA, and Title IX retaliation claims do not fail simply because Plaintiff had finished her studies at Vanderbilt's graduate school and had completed her graduate student employment at the time of Dr. Demarest's conduct in March 2008 and July 2008.

In a case where a female former post-doctoral research assistant filed suit against a professor for defamation under state law and for gender discrimination under 42 U.S.C. § 1983, the district court found that seven statements in letters written by the professor were defamatory. Woodruff v. Ohman, 166 Fed. Appx. 212, 216 (6th Cir. 2006). For example, the professor stated that "'[f]or the last 2 and one-half years she has spent on this project, she has not been able to accumulate enough data for a single paper, and is still far from it.'" Id. The Sixth Circuit said, "It is reasonable to interpret this statement as defamatory, because, as the district court stated, '[i]t directly injures Plaintiff in her profession, by implying that she is unable to perform the scientific work at issue and that she is not a competent scientist.'" Id. In affirming on the defamation claims, the Sixth Circuit noted that "[a]n individual with Woodruff's level of education and achievement would likely be viewed with contempt if she was not able to perform the basic duties of her job, and this is thus clearly related to her professional reputation." Id.

While the Court recognizes that this is not a defamation case against Dr. Demarest, the injury to the plaintiff described in Woodruff is similar to the injury Plaintiff alleges in this retaliation

25

lawsuit. To disallow this suit and any potential remedy at the summary judgment stage on the ground that Plaintiff had received her Ph.D. degree and was no longer a Vanderbilt graduate student assistant in 2008 would undermine the objectives of the antiretaliation statutes. See Robinson, 519 U.S. at 346; Jackson, 544 U.S. at 179.

Vanderbilt next contends that Plaintiff cannot proceed on her claims because she cannot meet any of the four elements of her *prima facie* case. Vanderbilt especially notes that Plaintiff has not produced any evidence of a materially adverse employment action taken against her, nor has she shown a causal connection between protected activity and the alleged adverse employment action.

The Court concludes that Plaintiff has produced sufficient evidence for summary judgment purposes to show that she engaged in protected activity as a graduate student and as a graduate student assistant and that Vanderbilt knew she had engaged in such protected activity. The first two elements of the *prima facie* case are met.

As just explained, reviewing White, Robinson, and Jackson, retaliation claims need not be restricted to materially adverse employment actions. Plaintiff may litigate alleged retaliatory conduct that does not relate to employment or which occurred outside the Vanderbilt graduate student assistant workplace. An action is materially adverse if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 57.

There are numerous genuine issues of material fact in this record as to whether Dr. Demarest, acting as an agent of Vanderbilt, and whether Vanderbilt itself engaged in conduct that could well dissuade a reasonable Vanderbilt graduate student, TA, or research assistant from making or supporting a charge of discrimination, such that the conduct would qualify as material adverse action under White. There is also abundant evidence of a causal connection between Plaintiff's prior Title VII protected activity, particularly the filing of her first federal lawsuit in August 2007, and Dr.

26

Demarest's conduct in March 2008, shortly after the parties reached a settlement agreement in the prior lawsuit in early January 2008. Dr. Demarest's conduct continued in July 2008 after Plaintiff filed her second EEOC charge in April 2008. The Court concludes that Plaintiff has established her *prima facie* case of retaliation under the applicable statutes.

The burden of production thus shifts to Vanderbilt to enunciate a legitimate, nondiscriminatory reason for its own actions and those of Dr. Demarest. Vanderbilt produces extensive evidence supporting its claim that Dr. Demarest acted out of legitimate and good faith scholarly disagreement with Plaintiff and that Vanderbilt filed the Chancery Court lawsuit in a good faith effort to enforce the terms of the settlement agreement.

The burden thus shifts back to Plaintiff to produce evidence that Vanderbilt's given reasons are a pretext for retaliation. Harris, 594 F.3d at 486 (plaintiff may establish pretext by showing proffered reasons had no basis in fact, did not actually motivate the action, or were insufficient to motivate the action). The Court concludes that Plaintiff has produced substantial evidence in addition to her *prima facie* case to show for summary judgment purposes that a reasonable jury could find in her favor on the ultimate issue of retaliation. Even without considering the expert report of Dr. Monaghan, which is still at issue, Plaintiff produced evidence to raise genuine issues of material fact about whether Dr. Demarest's public statements and actions at the March 2008 conference and his statements at the July 2008 conference constituted scholarly criticism of her work or amounted to an attempt to sabotage her career. Dr. Demarest admitted he raised a concern to the University of Colorado Press about whether Plaintiff committed copyright violations, and Plaintiff presented computer forensics evidence from which a jury could circumstantially infer that Dr. Demarest played a role in drafting the email communications sent from Luin to Plaintiff about the copyright issue. Although Dr. Demarest and Luin deny Plaintiff's version as to how these email

27

communications and documents were created, such denials simply generate another material dispute of fact for the jury to decide. Finally, while Vanderbilt contends the filing of the state lawsuit was a legitimate attempt to enforce a binding settlement agreement, material issues of fact exist as to what statements Dr. Demarest made during his presentations at the March and July 2008 conferences, whether Dr. Demarest's statements and actions fell within the non-disparagement provision of the settlement agreement, and whether Vanderbilt acted from a proper or improper motive when it filed the state court lawsuit and sought to enjoin consideration of Plaintiff's second EEOC charge.

## IV. CONCLUSION

For all of the reasons stated, Plaintiffs' Motion For Partial Summary Judgment (Docket Entry No.73) will be denied; Defendant's Motion For Summary Judgment (Docket Entry No. 76) will be denied; Defendant's Motion To Strike Report Of Dr. Estrada-Belli (Docket Entry No. 113) will be granted; Plaintiff's Motion To Strike Defendant's Response To Plaintiff's Statement Of Material Facts Which Preclude A Grant Of Summary Judgment, D.E. 126 (Docket Entry No. 135) will be denied; and the Motion On Behalf Of The Defendant, Vanderbilt University To Exclude The Testimony Of Plaintiff's Expert Witness, John Monaghan, PhD. (Docket Entry No. 109), will be heard at the Final Pretrial Conference.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

28